UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 11-80002-CIV-MARRA

PATTY PHILLIPS, as Personal Representative
of the Estate of ADAM PHILLIPS, deceased,
and on behalf of the survivor thereof,
PATTY PHILLIPS,

        Plaintiff,

v.

RIC L. BRADSHAW, as Sheriff of Palm Beach
County, Florida and CPL. RICHARD LOGSDON
and LT. EDWARD WORTHINGTON,

        Defendants.

_____/

## OPINION AND ORDER

THIS CAUSE is before the Court upon Defendant Sheriff Ric L. Bradshaw's Motion for

Summary Judgment [DE 49], Defendant Richard Logsdon's Motion for Summary Judgment [DE

52], and Defendant Edward Worthington's Motion for Summary Judgment [DE 53].  The

motions are fully briefed and ripe for review. The Court has carefully reviewed the pleadings, the

motion papers, including all supplemental authority provided to the Court after the submission of

the motion papers, and is otherwise fully advised in the premises.

## BACKGROUND

The tragic facts of this case which resulted in the shooting death of Adam Phillips, as

culled from the pleadings and all of the motion papers, including the exhibits submitted in

connection therewith, and reasonably inferred therefrom in the light most favorable to the

Plaintiff for the purpose of these motions[1], are as follows:

On December 1, 2008, at 7:45 p.m., Plaintiff Patty Phillips gave a Statement to the Palm

Beach County Sheriff's Office reporting that her son, Adam Phillips, had stolen her car and

purse. She reported:

> While waiting for a bed to be available at D.A.F., I was asked if I
> would allow my son to stay with me. He is bi-polar and a drug
> addict who surely needs this treatment. At approximately 630 pm
> [sic] this December 1st, 2008, while my back was turned for just an
> instant, my son, Adam Phillips, grabbed my purse with cell phone
> + keys attached and exited my condo. I pursued but he was already
> in the vehicle + locked me out as I approached. I attempted to stop
> him until a neighbor cautioned me to let go before I got injured.
> My son has no license to drive and because of his history, has
> never been given nor would be given permission to drive my
> vehicle.  I carefully guard my purse + keys but I slipped up this
> time. Within my purse are my wallet, credit cards, debit cards,
> address book. Within my car is my Mom's wheelchair, with
> accessories, my current bills waiting to be paid, my secret coin
> stash, etc.
> I fully intend to prosecute this theft.

[DE 59-7].

This entire case hinges upon what occurred during the approximately three to five

minutes[2] after the police surrounded the stolen car culminating in the fatal shooting of Adam

---

[1]Since Adam Phillips died at the scene, the Court derives the facts from the deputies' accounts. Where there is a discrepancy in the testimony of the deputies, the Court has resolved the dispute by using those facts most favorable to Plaintiff.  *See, e.g., McCullough v. Antolini*, 559 F.3d 1201, 1202 (11th Cir. 2009).

[2]Lt. Worthington testified that from the time he arrived on the scene to the time he heard the gunshots was three to five minutes. [Worthington EBT, DE 58-4 at 50].  Cpl. Logsdon testified that from the time he arrived on the scene until the time he discharged his weapon was approximately two to four minutes, maybe five. [Logsdon EBT, DE 58-7 at 110].  Agent Imperio testified that from the time he arrived on the scene to the shooting was maybe five minutes.

Phillips by Defendant Cpl. Richard Logsdon.  A detailed review of the evidence before the Court paints a generally consistent account of the events that evening.

Agent Richard D'Imperio, a road patrol deputy with the Palm Beach Sheriff's Office ("PBSO") Tactical Unit, received a phone call from Deputy Andrew Roussel asking whether a third deputy was taking a stolen vehicle report [D'Imperio EBT, DE 59-1 at 4-5, 7].  The deputy advised Agent D'Imperio that he believed that he was behind the vehicle [*Id.* at 5].

Agent D'Imperio went to the area and fell in behind Deputy Roussel [*Id.* at 7]. The stolen car was not speeding; there were no traffic violations or infractions being committed; the car was not being driven recklessly. [*Id.* at 7-8]. Of the testimony before the Court, Agent D'Imperio is the only witness whose contact with the vehicle began at this early stage and continued through the time that the decedent was shot by Cpl. Logsdon.  Agent D'Imperio testified that at no time after his involvement began did the stolen vehicle try to run over a law enforcement officer. [*Id.* at 8]. At no point prior to the shooting was he made aware that the driver was the vehicle owner's son.[3] [*Id.* at 9].

Agent D'Imperio and Deputy Roussel were told by a supervisor over the radio to wait for back-up before they tried to stop the vehicle. [*Id.* at 9].  They continued to follow the vehicle

_____

[D'Imperio EBT, DE 59-1 at 39].

[3]All of the other officers testified similarly on this point, and there is no dispute that none of the participants in the event leading up to the shooting had this information. [Worthington EBT, DE 58-4 at 16-17; Logsdon EBT, DE 58-7 at 69, 138-39; Cahir EBT, DE 59-4 at 30]. Agent D'Imperio testified that he did not think knowing that information would have changed anything. [DE 59-1 at 40-41]. Sergeant Cahir also did not think that having that information would have made a difference. [DE 59-4 at 37]. Cpl. Logsdon, on the other hand, testified that if they had the knowledge that the driver was the son of the car's owner, a watch commander might have called off approaching the vehicle. [DE 58-7 at 69-70]. Lt. Worthington testified that this knowledge "would have opened up other avenues". [DE 58-4 at 148].

until it stalled, started back up again, and then came to a stop where there were lots of police vehicles in the area. [*Id.* at 10-14]. Agent D'Imperio got on the public address ("P.A.") system, identified himself as being from the Palm Beach County Sheriff's Office, and directed the driver three times "to roll down the window or to open the door and to show us your hands. Stop the vehicle. Basically give up." [*Id.* at 15].

Defendant Lieutenant Edward Worthington was the watch commander for the region that evening. [Worthington EBT, DE 58-4 at 11]. A watch commander oversees the daily operations of uniformed personnel and assists them in performing their duties. [*Id.* at 12]. During the evening at issue, Lt. Worthington was in his patrol car driving around his assigned area. [*Id.* at 13]. He heard a call that a police car was possibly behind a stolen car. [*Id.* at 14]. He heard that the car was not violating traffic laws. [*Id.* at 19]. He did not hear anything about the driver trying to run over any law enforcement officer, trying to assault a law enforcement officer or committing a violent felony. [*Id.* at 21-22]. He heard that the car broke down and got started again. [*Id.* at 22].

When Lt. Worthington arrived at the scene, he parked about 30 feet from the rear of the driver's side of the stolen car. [*Id.* at 28-29]. The Boynton Beach Police Department had blocked the road south of the stolen car. [*Id.* at 29].[4] There were two police cars next to Lt. Worthington's car, and many additional police cars behind them. [*Id.* at 29]. The stolen vehicle

---

[4] Although Lt. Worthington testified that there were no stop sticks around the vehicle, [Worthington EBT, DE 58-4 at 30], according to Agent D'Imperio, the Boynton Beach Police had put down stop sticks. [D'Imperio EBT, DE 59-1 at 16]. Cpl. Logsdon also saw the stop sticks. [Logsdon Statement, DE 58-8 at 5]. Stop sticks are long sleeves with plastic pieces that have punctures in them. When a tire rolls over them, the punctures come out of the plastic and go into the tire, puncturing the tire. [D'Imperio EBT, DE 59-1 at 55-56]. If the car had gone forward, the tires would have gone over the stop sticks. [*Id.* at 16].

had tinted glass, and the officers could not see through the tint. [Logsdon EBT, DE 58-7 at 66; Cahir Statement, DE 59-5 at 15; D'Imperio EBT, DE 59-1 at 42].[3]

Lt. Worthington had a deputy on the P.A. system ordering the driver to get out of the car. [Worthington EBT, DE 58-4 at 36, 56]. Although no one ever told him how many people were in the car, Lt. Worthington testified that he was convinced that there was only one person in the car. [*Id.* at 36-37]. Cpl. Logsdon also testified that he did not know if anybody else was in the car. [Logsdon EBT, DE 58-7 at 118]. Lt. Worthington had no information that the driver was armed with any type of weapon or that the driver had committed a violent felony. [Worthington EBT, DE 58-4 at 43]. Cpl. Logsdon similarly had no information that the driver was armed. [Logsdon EBT, DE 58-7 at 74].

Lt. Worthington testified that he could hear the person in the car trying to re-start the car, but it was not starting.[4] [Worthington EBT, DE 58-4 at 38]. He was concerned that he "cannot let this car get started a second time and move." [*Id.*]. Lt. Worthington further testified that he "knew when [the driver] was trying to get this thing still started again, he's not coming out. If he was coming out he wouldn't be trying to get the car started, he would be coming out." [*Id.* at

---

[3]Although Lt. Worthington testified that he could see the driver moving in the car, [DE 58-4], at his post-incident walk through approximately five hours after the incident, in response to an inquiry to describe his ability to see into the vehicle, he responded "I could not see into it at all [through] the tint." [DE 58-5 at 8]. He also specifically said, "I could not see any movement inside the vehicle." [*Id.*].

[4]Sergeant Cahir testified that when he arrived at the scene, the car was continually trying to restart. One time, it did restart, moved a few feet and shut down again. He viewed this as consistent with the car having run out of gas. [Cahir EBT, DE 59-4 at 8-9]. Lt. Worthington also saw this. [Worthington EBT, DE 58-4 at 129]. Agent D'Imperio, however, testified that although he heard the car being cranked, it never moved any distance after it stalled out at the scene of the incident. [D'Imperio EBT, DE 59-1 at 53].

132]. Lt. Worthington was also concerned that if he got the car restarted, the public might be in danger. [*Id.*]. Lt. Worthington explained his opinion that the longer things dragged on, and the driver saw that he was not getting away, he might become more desperate and take a hostage. [*Id.* at 133].

Lt. Worthington formulated two plans.  One was to block off the area to prevent the car from moving[5], and the second one was to send in a stick team to go in and extract the driver from the car.  [*Id.* at 43-44].  He decided to use a stick team.  [*Id.* at 44]. A stick team contains a minimum of three law enforcement individuals, including a K-9 unit with a dog, an individual carrying a shield, and an individual with a rifle.  [*Id.*].

Corporal Richard Logsdon was a Corporal/Trainer for the Palm Beach County Sheriff's Office K-9 Unit. [Logsdon EBT, DE 58-7 at 5].  He responded to the scene when he heard over the radio about the stolen vehicle. [*Id.* at 39].  He testified that he heard that they tried to stop the vehicle, and it refused to stop. [*Id.* at 40].  He also testified that he heard a deputy on the radio say that the vehicle tried to hit him. [*Id.* at 41]. Not only that, but he testified that he believed that he heard another deputy say that the vehicle tried to hit him as well. [*Id.*]. He did not relay this to the Palm Beach County Sheriff's investigators who conducted the walk-through after the incident. [*Id.*; Logsdon Statement, DE 58-8 at 3-4]. None of the other witnesses heard this over the radio, and the testimony of Agent D'Imperio, who followed the car all the way to the scene

_____

[5]Although the car was blocked in part, both Lt. Worthington and Cpl. Logsdon testified that the car could have gone over the curb to the west, where there was an open field. [Worthington EBT, DE 58-4 at 29-30; Logsdon EBT, DE 58-7 at 47]. No attempt was made to block off this area. [Logsdon EBT, DE 58-7 at 107]. Lt. Worthington felt that there were more places that the car could have gone than Cpl. Logsdon did. [Worthington EBT, DE 58-4 at 29-30; Logsdon EBT, DE 58-7 at 46-47].

where it broke down, did not confirm this. [Cahir EBT, DE 59-4 at 7; D'Imperio EBT, DE 59-1 at 8; Worthington EBT, DE 58-4 at 21].

When Cpl. Logsdon arrived at the scene, Lt. Worthington was in charge. [Logsdon EBT, DE 58-7 at 45]. Lt. Worthington directed Sergeant Cahir to get a stick team together to approach from the driver's side; use a sage[6] to break the rear passenger window; and have the K-9 enter the vehicle to bite and incapacitate the driver, enabling the deputies to remove the driver from the car.[7] [*Id.* at 56-57, 101].

Cpl. Logsdon testified that it was his idea to use the sage. [*Id.* at 49-50; Logsdon Statement, DE 58-8 at 5]. He suggested this because of a situation he had been in four or five years earlier when two men who had just killed a Broward Sheriff's Office deputy were found in a vehicle with dark windows and hosing going from the exhaust into the window. It was suspected that they were trying to commit suicide. The police approached the vehicle to try to bang out the windows. [Logsdon EBT, DE 58-7 at 52-54]. Cpl. Logsdon testified, "One of the sickest feelings I have in my life is standing there attempting to cover them and looking into a window where I knew these two individuals were and I couldn't see anything." [*Id.* at 54]. He noted, "It's a very dangerous situation being this close, trying to get into a vehicle when it's

---

[6]A sage is a weapon that is a safe distance tool. It has a big cylinder that holds ammunition. [Lt. Worthington EBT, DE 58-4 at 57-58, 60]. It shoots a hard rubber baton. [Captain Mattino EBT, DE 67-1 at 27].

[7]Sergeant Cahir testified that all Lt. Worthington told him was to put some rounds through the window. He denied having been told anything about the dog being released into the car. [Cahir EBT, DE 59-4 at 14, 32]. Sergeant Cahir thought it was an attempt to motivate the driver to come out and surrender. [*Id.* at 14]. Agent D'Imperio also testified that he was not told what the plan was by Lt. Worthington, Cpl. Logsdon, or Sergeant Cahir. [D'Imperio EBT, DE 59-1 at 33-34].

7

locked and difficult to get into." [*Id.*].  His idea with the sage was to blow out the window quickly as opposed to trying to do it closer to the car. [*Id.* at 55].  Agent D'Imperio testified that he had never fired into a car with a sage weapon before. [D'Imperio EBT, DE 59-1 at 25].  Cpl. Logsdon had previously seen sages hit car windows. [Logsdon EBT, DE 58-7 at 78].

Cpl. Logsdon testified that he felt that they had to act quickly in case the driver got the car started again.  He said that the car was pointing towards the Boynton Beach police cars. [*Id.* at 56-61].  He said that they "felt like we had to do something. . . . that time didn't allow you to sit back and wait." [*Id.* at 62].  "We felt that we had an opportunity to go ahead and apprehend him while the car was inoperable, before he got it operable again." [*Id.* at 65].

The stick team was in a wedge formation composed of Sergeant Cahir in front with the shield[8], Agent D'Imperio to the right with the sage and Corporal Logsdon and his K-9 on the left. [D'Imperio EBT, DE 59-1 at 18-19, 22; Cahir EBT, DE 59-4 at 16].  The stick team approached the car on the driver's side at an eight o'clock position. [Logsdon EBT, DE 58-7 at 74].  Cpl. Logsdon said that as the stick team approached, "We're kinda out here in the open at this point. So we need to, uh, you know, maybe act before we're acted upon." [Logsdon Statement, DE 58-8 at 8].

Almost immediately, the plan went awry.  The stick team was some distance[9] from the car

-------

[8]This was a "ballistic shield", which is bullet-resistant to all handgun rounds up to light rifle rounds. [Cahir EBT, DE 59-4 at 12].

[9]Agent D'Imperio testified that the stick team was between five and seven feet from the car, [D'Imperio EBT, DE 59-1 at 21, DE 59-3].  Cpl. Logsdon testified that they were seven yards, or about 20 feet from the car. [Logsdon EBT, DE 58-7 at 76].  Sergeant Cahir testified that they were three and a half to four and a half car lengths from the car. [Cahir EBT, DE 59-4 at 17].

on the driver's side.  When Agent D'Imperio tried to fire the sage, he discovered that he had forgotten to crank it up, and it would not fire. [D'Imperio EBT, DE 59-1 at 23].  He cranked up the sage and fired one round into the driver's side rear window. [*Id.* at 24, Logsdon EBT, DE 58-7 at 76].  The first shot did not have the desired effect. Instead of shattering the window so that the dog could go into the car, due to the thickness of the tint on the glass, the shot from the sage only put a three inch round hole in the window. [Worthington EBT, DE 58-4 at 58; D'Imperio EBT, DE 59-1 at 25; Logsdon EBT, DE 58-7 at 78].

Sergeant Cahir testified that after the first round was fired from the sage, a series of verbal commands were given to the person in the vehicle to come out and show your hands. [Cahir EBT, DE 59-4 at 15].[10]  The driver continued unsuccessfully to try to start the car. [*Id.*]. A second shot from the sage into the front driver's side window had a similar effect as the first shot. [D'Imperio EBT, DE 59-1 at 26; Logsdon EBT, DE 58-7 at 79].  After the second shot from the sage, Sergeant Cahir gave more verbal commands. He was screaming, "Sheriff's Office. Step out of the vehicle with your hands up.  Let me see your hands."  [Cahir Statement, DE 59-5 at 8-9].

After the sage rounds were fired, Agent D'Imperio heard a muffled type of voice coming from inside the vehicle, but he could not understand what was being said. [D'Imperio EBT, DE 59-1 at 32]. [11] Agent D'Imperio was going to shoot the sage again to try to get the window to

---

[10]Lt. Worthington testified that commands for the driver to exit the vehicle were initially given over the P.A. for about 30 seconds. [Worthington EBT, DE 58-4 at 129].  He explained that once the stick team starts giving commands, they are in control, and commands from the P.A. system stop. [*Id.* at 130].

[11]In his post-incident walk-through, Deputy D'Imperio described the driver as "yelling something", "screaming something", after the two sage rounds were fired, but nobody could

break out, when Cpl. Logsdon said let's make our approach. [*Id.* at 26]. This command did not come from Lt. Worthington. [*Id.*; Worthington EBT, DE 58-4 at 99-100].[12] Cpl. Logsdon testified, "We deemed that we were going to discontinue with the contingent of blowing out the windows with the sage and we were going to go ahead and try to get him out. . . .Whether it be breaking the window with something else or the shield or baton or whatever." [Logsdon EBT, DE 58-7 at 83]. When asked why he followed Cpl. Logsdon's command, Agent D'Imperio testified, "it was just spur-of-the-moment thing, that's what he said to do and that's what we did. I can't tell you what I was thinking at the time, why am I listening to this guy. But that's what we do, we just trust each other and do it." [D'Imperio EBT, DE 59-1 at 51].

Sergeant Cahir testified that as they were moving towards the car, they did so from a safe angle towards the driver's side rear window, almost directly from behind. [Cahir EBT, DE 59-4 at 18]. He testified "it's keeping . . . in mind that if he was going to shoot us, he would have to almost turn around in his seat to do it." [*Id.*].

Sergeant Cahir placed the shield up against the car just in front of the driver's side door and tried to open it. [*Id.* at 19]. As Sergeant Cahir lifted the handle and discovered that the door was locked, Cpl. Logsdon started saying "in a very excited utterance - - that he's reaching for something. His voice is very high pitched. He's excited." [*Id.* at 20; Cahir Statement, DE 59-5

---

understand him. [D'Imperio Statement, DE 67-3].

[12]Sergeant Cahir testified that this command came from Lt. Worthington. It should be noted that he was the only one to so testify, and he equivocated by saying that he believed that it was Lt. Worthington. [Cahir EBT, DE 59-4 at 17].

at 10].[13]

Cpl. Logsdon testified that by using the light on the end of his weapon, he looked through the hole in the car window made by the sage. [Logsdon EBT, DE 58-7 at 84]. He could see the driver's right thigh and right pocket area. [*Id.*].  "I could see just the silhouette of the front of him and I could see his hand trying to get into his pocket." [*Id.* at 84-85, 88]. He described the driver's movement as frantic. [*Id.* at 88].  He did not see a bulge in the pocket in the shape of any type of weapon. [*Id.* at 88-89].  Cpl. Logsdon was screaming for the driver to show him his hands and get his hands up where he could see them. [*Id.* at 89]. The driver did not do so. [Logsdon Statement, DE 58-8 at 9].  Cpl. Logsdon screamed to the other officers that the driver was trying to get something out of his pocket. [*Id.*]. He did not hear the driver say anything. [*Id.* at 139].

Cpl. Logsdon testified that he "was scared to death that he was trying to retrieve something out of his pocket . . . a weapon . . . that he would possibly use towards us." [*Id.*]. He testified that, "[t]here was no reasoning [sic] for him to be doing what he was doing at the time other than to do harm towards us." [*Id.* at 91].  Despite the fact that Cpl. Logsdon did not see the shape of any weapon or a bulge in the driver's pants; had no information that this particular suspect was armed or dangerous; and had not learned any details relative to who the driver was or how the car had been stolen, he felt that because the driver was frantically trying to get into his pocket, he was reaching for a weapon.  [*Id.* at 92-93].

When asked how long he saw the driver trying to get his hand into his pocket, Cpl. Logsdon estimated that it was ten to fifteen seconds, although he then said, "I don't know."

---

[13]When asked whether Cpl. Logsdon's statements were excited, Sergeant Cahir testified, "That's an understatement." [Cahir EBT, DE 59-4 at 38].

[Logsdon EBT, DE 58-7 at 140]. In his post-incident interview four hours after the incident, Sergeant Cahir testified that Cpl. Logsdon discharged his weapon within two to three seconds of his first stating that there was a problem. [Cahir Statement, DE 59-5 at 10]. Lt. Worthington testified to the short amount of time between the second sage shot and Cpl. Logsdon firing his weapon. [Worthington EBT, DE 58-4 at 100].

Cpl. Logsdon stated that he "had a sick, a fearful feeling about him trying to get whatever it was he was [frantically] trying to get out of his front pocket. I felt like I needed to act before acted upon." [Logsdon Statement, DE 58-8 at 11 (bracketed words in original)]. Cpl. Logsdon testified that he felt that he "shouldn't have waited before I'm staring down the end of another weapon to see if he's going to shoot at me first before I shoot." [Logsdon EBT, DE 58-7 at 93]. He shot the driver five times aiming at center mass. [*Id.* at 115]. When asked why he shot five times, he testified, "I was scared. That's how many I felt like I needed to shot [sic] him." [*Id.*].

Sergeant Cahir testified that Cpl. Logsdon repeated two or three or four times "that he's digging into his pocket, he's reaching for something, but each and every time he said it he got more excited." [Cahir EBT, DE 59-4 at 22]. Sergeant Cahir could not recall whether or not Cpl. Logsdon told the driver to put his hands in the air or anything along those lines. [*Id.*]. In his post-incident walk through, Agent D'Imperio said that Cpl. Logsdon gave the command, "Show me your hands, show me your hands." [D'Imperio Statement, DE 59-2 at 5]. Agent D'Imperio testified that Cpl. Logsdon yelled "gun" right before the shots rang out, [D'Imperio EBT, DE 59-1 at 29-30, 57], although in his post-incident walk through approximately five hours after the incident, he stated that Cpl. Logsdon said, "gun" after the rounds were fired. [D'Imperio Statement, DE 67-3]. There is no evidence that anyone stated that force would be used if the

12

driver did not show his hands.

Sergeant Cahir was getting ready to retreat when Cpl. Logsdon plunged his firearm into the car discharging his gun five times. [Cahir Statement, DE 59-5 at 11]. After Cpl. Logsdon discharged his weapon, Sergeant Cahir pulled Cpl. Logsdon and used the shield to protect the group as they moved back around the rear of the car and around to the passenger side. [Cahir EBT, DE 59-4 at 24-25; Cahir Statement, DE 59-5 at 11].

Looking through the dark tinted window, Sergeant Cahir could see that the driver was slumped over into the passenger side of the car. [Cahir EBT, DE 59-4 at 25].  The driver was not moving. [*Id.*]. Sergeant Cahir used his shield to smash out the passenger side front window of the car. [*Id.*].  He reached in and unlocked the door, opened it and pulled the driver out. [*Id.*].  The driver was still alive, although he did not appear to be conscious. [Cahir Statement, DE 59-5 at 12]. A deputy started attempting to do CPR. [Logsdon EBT, DE 58-7 at 117]. Cpl. Logsdon told an officer to check all of the driver's pockets.  There was nothing in any of them.  [*Id.*].  No weapon was found on the driver, [D'Imperio EBT, DE 59-1 at 45].  Mr. Phillips expired at the scene. [Cahir Statement, DE 59-5 at 13].

At a post-incident debriefing with Captain Robert Allen, Lt. Worthington, Cpl. Logsdon, Sergeant Cahir and Agent D'Imperio were told that the perception was that they had moved too quickly after giving the command on the P.A. system. [D'Imperio EBT, DE 59-1 at 36-37; Logsdon EBT, DE 58-7 at 96, 99-100; Cahir EBT, DE 59-4 at 43].[14]  Agent D'Imperio and Cpl.

---

[14]Lt. Worthington testified that he had heard that some staff members agreed with Captain Allen and some did not. He heard that "[t]wo majors spoke up and said that I did exactly what I was supposed to do, that we were taught to do in extractions from vehicles." [Worthington EBT, DE 58-4 at 134].

Logsdon also attended an in-service training pertaining to this particular incident. [D'Imperio EBT, DE 59-1 at 38, Logsdon EBT, DE 58-7at 134-136].  The entire agency took part in this in-service training. [Logsdon EBT, DE 58-7 at 141].

Sergeant Cahir attended an in-service training for supervisors that included a discussion of this incident. [Cahir EBT, DE 59-4 at 33]. It was brought up that things "could have been slowed down a little.  There was no rush to move up on the car and maybe it could have been handled as a barricade." [*Id.* at 34-35]. When asked whether he felt that there was any necessity to rush in and approach the car, Sergeant Cahir testified that he thought that "the amount of time and the amount of commands that were given were extremely appropriate.  And there was no reason to think that it was anything other than a stolen car with somebody who is not willing to surrender.  And it wouldn't be any different than any of the other hundreds of arrests that we made in dealing with a stolen motor vehicle." [*Id.* at 44-45].

Lt. Worthington also attended an in-service training for supervisors where this incident was discussed. [Worthington EBT, DE 58-4 at 83-84].  He testified that time is your friend scenarios were discussed, although he did not recall whether that was discussed as to this case. He recalled that there was a lot of discussion about this not being a barricaded suspect. [*Id.* at 85].

**Palm Beach County Sheriff's Office Policies**

Defendant Bradshaw identified Captain Ronald Mattino as the person with the most knowledge concerning issues regarding general training and policies of the Palm Beach County Sheriff's Office ("PBCSO") relative to the facts of this case. [DE 58-1].  In support of their motions for summary judgment, Defendants submitted an affidavit from Captain Mattino with

14

various PBCSO policies. [Mattino Affidavit, DE 50]. Captain Mattino was also deposed in this case. [Mattino EBT, DE 67-1].

Captain Mattino affirmed that all of the defendants met all of the requirements to be law enforcement officers under Florida Statute Chapter 943. [Mattino Affidavit, DE 50-1 at 3]. PBCSO provides in-service training in an amount exceeding state requirements and in full compliance with the Criminal Justice Standards and Training Commission/F.D.L.E. (Florida Department of Law Enforcement). [*Id.*].

Captain Mattino affirmed that all deputy sheriffs "are trained that they are only authorized to use that amount of force which is reasonable and necessary under the circumstances and are otherwise not authorized to use excessive or unnecessary force." [*Id.*]. He continued that the PBCSO "does not have a pattern or practice of tolerating the use of excessive force. Where it is shown that a deputy sheriff has used excessive force upon someone, that deputy will be subject to administrative sanctions including, but not limited to, termination." [*Id.*].

Cpl. Logsdon testified that the shooting fell within the portion of PBCSO General Order 500.00 that addresses shooting to prevent imminent death or great bodily harm to the sworn member or another individual. [Logsdon EBT, DE 58-7 at 126-7]. The purpose of General Order 500.00 is to establish guidelines for the use of deadly force. [DE 50-1 at 6]. It provides, in relevant part, that deputies "are authorized to use deadly force when there is reasonable belief that such force is necessary to: 1. Prevent imminent death or great bodily harm to the sworn member. 2. Prevent imminent death or great bodily harm to another individual . . . ." [*Id.* at 7]. It also states: "If feasible, a verbal warning should be given before deadly force is used." [*Id.*]. The General Order requires all Sheriff's Office members to be "issued copies of and instructed in the

agency's use of force policies before they are authorized to carry a weapon or are placed in a position where they may use deadly and non-deadly force." [*Id.* at 6].

Additional General Orders submitted to the Court are General Order 500.01, "Use of Non-Deadly/Less Lethal Force", and Addendums thereto [DE 50-1 at 10-20]; General Order 518.00, "Criminal Arrests", [DE 50-1 at 21-26]; General Order 202.00, "Discipline Procedures - Informal and Formal Action, [DE 50-1 at 27-35]; General Order 222.03, "Bureau of Internal Affairs (IA)", [DE 50-1 at 36-44].

General Order 500.01, "Use of Non-Deadly/Less Lethal Force", provides, in part,

> The most important purpose of law enforcement is the protection of human life.  In order to be consistent with that purpose, the use of non-deadly/less lethal force must be limited to situations involving resistance to arrest, defense against physical assault or force necessary to perform official duties and/or self defense or in the defense of others.

[DE 50-1 at 10].  This General Order contains a "use of force continuum" beginning with identification of authority and commands of direction or arrest.  It continues from that to soft control techniques.  It then increases to Aerosol Subject Restraint and PepperBall Launcher.[15] Following that are hard control techniques such as impact weapon strikes, use of canines and less lethal, specialty impact munitions.  A sage is a less lethal specialty impact weapon. [*Id.* at 19]. The final level is the use of deadly force. [*Id.* at 12-13].  "Escalating the level of control is accomplished by using the ONE PLUS ONE THEORY of escalation, and only escalating to the next level of force that is justified considering the amount of resistance given and the potential

---

[15] "A launcher that uses compressed air to fire frangible plastic spheres that are built to burst on impact. The spheres contain Oleoresin Capsicum (OC) powder . . . ." [DE 50-1 at 18]. "The use of PepperBall is authorized when the use of lesser control measures is perceived to be inadequate and the use of greater measures could lead to injury." [*Id.* at 18].

for injury to the subject by using that type of control." [*Id*. at 13-14].

Addendum 500.01(D) to General Order 500.01 sets forth when less lethal/specialty impact weapons like a sage may be used.  These circumstances include, but are not limited to:

1.  Suicidal persons who pose an immediate threat of great bodily harm or death to employees or others in order to achieve their suicidal intent.

2.  Subduing vicious animals that could cause great bodily harm, endanger lives of employees involved, or cause a threat to public safety.

3.  Suspect to be arrested has the immediate ability to cause great bodily harm or death to the employees and others.

4.  Restoration or maintenance of order during violent and/or armed inmate resistance, jail disturbances, or civil disturbances that would otherwise result in great bodily harm or death to Sheriff's Office employees or others.

[*Id.* at 19].

Captain Mattino is the Commander of the Training Division of the PBCSO. [Mattino EBT, DE 67-1 at 7].  He testified that if a sage were shot directly at someone's head, it would cause serious injury, and would be considered deadly force [*Id*. at 27].  It is designed to be shot at center mass. [*Id.*].  When asked if one would have any ability to know where a baton would land if it were shot into a dark window, he responded, "No". [*Id.*].  He did not recall training for the use of a sage in this manner. [*Id.*].

Captain Mattino testified that they do not train for a forcible extraction during a felony traffic stop "because at that point, if the driver refuses to come out, that is now a barricaded subject." [*Id.* at 35].  He agreed that at that point, the on-scene commander should be calling for the SWAT team. [*Id.*].  Lt. Worthington testified to the contrary.  He testified that if he had called

17

SWAT, they would not have responded, because this incident did not meet the criteria of a barricaded situation. [Worthington EBT, DE 58-4 at 45-46]. He testified that a forcible extraction was appropriate. [*Id.* at 190-192]. Sergeant Cahir agreed. He testified, "Whether somebody after the fact wants to say that, you know, this should have been handled as a barricaded subject, the only thing I can say to that is I have been a cop twenty-two years and I have never seen in an occupied stolen motor vehicle be handled in that form or fashion where you're going to block a roadway and call out a SWAT team. To my knowledge, it's never, ever been done and I have been on the SWAT team ten years." [Cahir EBT, DE 59-4 at 36].

## CONTENTIONS OF THE PARTIES

Plaintiff's Amended Complaint contains the following claims against the following Defendants:

Count I:      42 U.S.C. §1983 - Deprivation of Civil Rights against Defendant Logsdon [DE 20 at 5-7],

Count II:     42 U.S.C. §1983 - Deprivation of Civil Rights against Defendant Worthington [DE 20 at 7-9],

Count III:    42 U.S.C. §1983 - Deprivation of Civil Rights against Defendant Bradshaw, as Sheriff of Palm Beach County, Florida [DE 20 at 9-11],

Count IV:     Negligence against Defendant Bradshaw, as Sheriff [DE 20 at 11-13], and

Count V:      Assault and Battery against Defendants Bradshaw, as Sheriff, and Defendant Logsdon [DE 20 at 13-15].

Defendants move for summary judgment on the following grounds:

18

Defendant Logsdon seeks summary judgment on Count I on the basis that he is entitled to qualified immunity, arguing that he at no time violated the decedent's clearly established constitutional rights, and on Count V on the basis that his actions were not taken in bad faith, or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. [DE 52, 2].  These are the only Counts containing allegations against him. [DE 20, 5-7, 13-15].

Defendant Worthington seeks summary judgment on Count II on the basis that it is undisputed that Defendant Logsdon, not Defendant Worthington, used force upon Plaintiff's decedent, and that the required elements necessary to establish supervisory liability in a §1983 case do not exist here. [DE 53, 11-13].  This is the only Count containing allegations against Defendant Worthington. [DE 20, 7-9].

Defendant Bradshaw seeks summary judgment on Counts III, IV, and V, the only Counts containing allegations against him. Regarding Count III, he argues that no underlying constitutional violation occurred; therefore, whether a custom, policy, practice, or procedure existed that caused the alleged constitutional violation is moot.  [DE 49 at 10]. He further argues that there was no official policy that authorized the use of unconstitutional force, [DE 49 at 8]; there was no custom, procedure or practice authorizing such force, [DE 49 at 8]; and there was no failure to properly train or supervise officers. [DE 49 at 8-9].

Regarding Count IV, containing a state negligence claim, Defendant Bradshaw argues that Defendant Logsdon's discharge of his handgun was an intentional act, [DE 49 at 10]; that Defendants Logsdon and Worthington were not negligently hired, supervised or trained, [DE 49 at 11]; and the negligence claim is not properly brought against Defendant Bradshaw as the

actions taken by Defendants Logsdon and Worthington were not taken outside the course and scope of their employment with the Sheriff's office. [DE 49 at 11].

Regarding Count V, Defendant Bradshaw argues that he is entitled to summary judgment on this claim if Defendant Logsdon did not use excessive force, as Florida law has the same standard of reasonableness as that under the Fourth Amendment to the United States Constitution. [DE 49 at 12].

## **SUMMARY JUDGMENT STANDARD OF REVIEW**

The Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant  is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323.  After the movant has met its burden under Rule 56(a), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electronic Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) and (B).

## DISCUSSION

### A. Plaintiff's Claims for Deprivation of Civil Rights

The Eleventh Circuit has noted that

> Section 1983 enables a citizen to sue any person acting under color
> of state law who violates his or her federal constitutional rights.
> . . . The threat of litigation may stymie a police officer's ability to
> perform his duties effectively, however.  To address this concern,
> qualified immunity protects a police officer from liability under §
> 1983 if he was acting within his discretionary authority and his
> conduct did not violate "clearly established statutory or
> constitutional rights of which a reasonable person would have
> known."

*Garczynski v. Bradshaw*, 573 F.3d 1158, 1165-66 (11th Cir. 2009)(citations omitted).

Thus, in order for Defendants to claim qualified immunity, they must first demonstrate that they were engaged in a discretionary duty.  *Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004).  Plaintiff states in her opposing statement of material facts that the characterization whether the actions of the Defendants were in or outside the scope of their employment is a legal issue to be determined by the jury from the facts of this case. [DE 57 at 3-4]. Plaintiff submits nothing to support this statement, and, in fact, Plaintiff alleged in her Amended Complaint that both Defendant Logsdon and Defendant Worthington were acting within the course and scope of their employment. [DE 20 at 1-2]. Based on the record evidence, the Court therefore concludes, as a matter of law, that Defendants acted in a discretionary capacity when they tried to apprehend Plaintiff's decedent, who had stolen her car, purse and other property. [DE 59-7].

21

The Court having concluded that Defendants were engaged in discretionary duties, the burden then shifts to Plaintiff to show that qualified immunity should not apply because: (1) the officers violated a constitutional right, and (2) that right was clearly established at the time of the incident. *Garczynski*, 573 F.3d at 1166.

### 1. Was There a Violation of a Constitutional Right?

An individual's right secured by the Fourth Amendment to be free from unreasonable seizures includes the right to be free from the use of excessive force during a criminal apprehension. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989).  "*[A]ll* claims that law enforcement officers have used excessive force - deadly or not - in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." *Id.* at 395.

The standard of reasonableness in an excessive force inquiry is wholly objective, and the use of force is constitutional if the arresting officer's actions were objectively reasonable in light of the facts and circumstances confronting the officer.  The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than by hindsight. *Graham*, 490 U.S. at 396.

Under *Graham*, courts should determine the "objective reasonableness" of a seizure by balancing the "nature and quality of the intrusion" against the "governmental interests at stake." *Graham*, 490 U.S. at 396.  The Court must consider factors that include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to

make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving –

about the amount of force that is necessary in a particular situation." *Id*. at 396-97.

      The Eleventh Circuit has observed, in cases involving fleeing suspects,

> that a police officer may constitutionally use deadly force when the
> officer (1) "has probable cause to believe that the suspect poses a
> threat of serious physical harm, either to the officer or to others" or
> "that he has committed a crime involving the infliction or
> threatened infliction of serious physical harm"; (2) reasonably
> believes that the use of deadly force was necessary to prevent
> escape; and (3) has given some warning about the possible use of
> deadly force, if feasible. . . . Although these factors are useful, we
> cannot apply them mechanically, . . . and "we must still slosh our
> way through the factbound morass of 'reasonableness'". . . .

*Morton v. Kirkwood*, 707 F.3d 1276,__, 5:10-cv-01658-AKK, 2013 WL 471618 at 7-8 (11th Cir.

Feb. 8, 2013)(citations omitted).  The Eleventh Circuit has noted, however, that

> The Supreme Court has emphasized that there is no precise test or
> "magical on/off switch" to determine when an officer is justified in
> using excessive or deadly force. . . .Nor must every situation satisfy
> certain preconditions before deadly force can be used. . . . Rather,
> the particular facts of each case must be analyzed to determine
> whether the force used was justified under the totality of the
> circumstances.

*Garczynski v. Bradshaw*, 573 F.3d at 1166 (citations omitted).

      In determining whether there was a violation of Adam Phillips' right to be free from

excessive force during a criminal apprehension, the first question that the Court must consider is

whether, as Plaintiff argues, everything that occurred from the time that the police surrounded the

vehicle until the driver was shot by Cpl. Logsdon should be considered in evaluating the

reasonableness of the deputies' behavior.

      Plaintiff takes the position that the deputies did not have to approach the decedent's

vehicle so quickly, without taking the time to analyze the situation. [DE 60 at 8].  Plaintiff argues that this was a barricaded subject situation. [*Id.* at 9].  She posits that the decedent did not pose any immediate danger and that the plan to forcibly extract him from the car was not approved under any PBCSO policy. [*Id.* at 10].  She argues that the deputies should have considered less intrusive means of force such as lighting up the area with a helicopter; bringing the mobile command unit to the scene to address the barricaded subject; calling on the expertise of the SWAT team; learning the background facts that the decedent was addicted to drugs and had taken his mother's car[16]; considering shooting pepper spray into the car.  [*Id.* at 12].  She argues that this is not Monday morning quarter-backing, rather, it is part of a reasonableness inquiry. [*Id.*].  Basically, Plaintiff's argument is that "but for" the unreasonable, aggressive approach towards the vehicle, Cpl. Logsdon would not have seen the decedent moving in the vehicle and would not have shot him. [*Id.* at 10].

Although there are questions of fact whether the dynamic approach selected by Lt. Worthington and Cpl. Logsdon was consistent with the policies of the PBCSO,[17]  these factors

---

[16]The background facts, as set forth in Plaintiff's Statement given to the Palm Beach County Sheriff's Office, would not necessarily have made a reasonable deputy less concerned about the driver.  The report indicates that Plaintiff tried to stop her son, bi-polar and a drug addict, from driving off until a neighbor cautioned her to let go before she got injured. [DE 59-7]. The implication is that her son would have caused injury to her rather than stop the car. Although the deputies were unaware of this at the time of the incident, certainly had they done what Plaintiff now argues, namely, gather this information, it actually would have bolstered their concerns.

[17]Captain Mattino's testimony that when a driver refuses to exit a vehicle, he becomes a barricaded subject and SWAT should be called [Mattino EBT, DE 67-1 at 35], was different from the testimony of the deputies that this was not a barricaded subject situation. [Worthington EBT, DE 58-4 at 45-46; Cahir EBT, DE 59-4 at 36].  There are also questions whether the officers properly followed the "use of force continuum" in PBCSO General Order 500.01 and whether they properly used the sage when they could not see into the vehicle and had no idea

ultimately did not result in the use of excessive force against the decedent and, therefore, are not material to whether summary judgment should be granted in this case.  The approach towards the vehicle and the two firings of the sage did not result in any injury to the decedent.[18]  Had Cpl. Logsdon never fired into the vehicle, and had the confrontation been resolved without further incident, Adam Phillips would not have had a cause of action against anyone for a deprivation of his constitutional rights solely based upon these acts.  Thus, for purposes of considering whether there has been a constitutional violation, the inquiry must focus on the driver's failure to respond to the repeated police directives that he show his hands and his reaching for his pocket. The proper inquiry is not "but for" the approach to the vehicle, Cpl. Logsdon would not have been able to see into the window and therefore he would never have seen the driver reach into his pocket.

Defendant Worthington seeks summary judgment on Count II on the basis that it is undisputed that Defendant Logsdon, not Defendant Worthington, used force upon Plaintiff's decedent, and that the required elements necessary to establish supervisory liability in a §1983 case do not exist here. [DE 53, 11-13].  This is the only Count containing allegations against Defendant Worthington. [DE 20, 7-9].

Having determined that the dynamic approach did not constitute a deprivation of Plaintiff's decedent's constitutional rights, summary judgment must be granted to Lt. Worthington.   It is uncontroverted that Lt. Worthington was not involved in the decision to shoot

---

how many people were inside.

[18]The extent of the injury inflicted is one of the factors to be considered in evaluating whether there has been a constitutional violation.  *See, e.g., Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002).

25

Plaintiff's decedent.  Lt. Worthington posits that Plaintiff may be trying to hold him personally liable based upon a theory of supervisory liability [DE 53 at 11]; however, the Court finds no such allegation in the Amended Complaint [DE 20], and Plaintiff does not respond to this argument in her brief, [DE 60].[19]

The Court now turns its analysis to whether Cpl. Logsdon's decision to shoot Adam Phillips, as a matter of law, struck an objectively reasonable balance between Phillips' interests and society's interests.  Would a reasonable officer in Cpl. Logsdon's position have thought that deadly force was necessary because the driver posed an imminent threat of danger to himself and/or the other deputies comprising the stick team?  *See, e.g., Harrell v. Decatur Cnty., Ga.,* 22 F.3d 1570, 1580 (11th Cir. 1994)(Dubina, J., dissenting), *vacated by* 41 F.3d 1494 (11th Cir. 1995)(adopting Judge Dubina's dissenting opinion).

The Plaintiff's Statement of Material Facts Submitted in Opposition to Worthington's and Logsdon's Motions for Summary Judgment claims that there exist the following material questions of fact: a dispute as to the actual time of the shooting [DE 57 at 4 ¶3]; a dispute about whether there were avenues of escape [*Id*. at ¶9]; a dispute over whether Logsdon heard that a stolen vehicle was simply being followed as opposed to being followed and not stopping for a police vehicle and whether deputies reported that the vehicle tried to hit them [*Id*. at 4-5, ¶10]; a dispute over whether the vehicle was already blocked in and whether a forcible extraction was a safe method to use [*Id*. at 5, ¶14]; a dispute over whether the decedent was continuously ordered out of his car while the stick team approached (although Plaintiff concedes that orders were made

---

[19] The Court is not suggesting that this would have been a viable claim against Lt. Worthington.  It is simply unnecessary for the Court to address it since it is not before the Court.

before the stick team made its approach) [*Id*. at ¶16]; a dispute over whether Logsdon could have become aware of the circumstances surrounding the stolen vehicle [*Id*. at 5-6, ¶17]; and a dispute over where the stick team was as it approached the vehicle [*Id*. at 6, ¶23].

Most of these alleged material questions of fact relate to the dynamic approach rather than to the actual shooting.  Regardless, in cases where there are questions of fact, the Eleventh Circuit has held that since in a qualified immunity analysis, district courts must take the facts in the light most favorable to the party asserting the injury, the court already has the plaintiff's best case before it. *Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005).  This Court has viewed all facts in the light most favorable to the Plaintiff herein and has applied the law to that fact pattern.

In Plaintiff's Statement of Material Facts Submitted in Opposition to Sheriff's Motion for Summary Judgment, Plaintiff does state that "[t]here is a dispute over whether the decedent appeared to be reaching for a weapon . . . ." [*Id*. at 7, ¶2]; however, this really amounts to a dispute relative to the characterization of the facts, not a dispute as to the facts themselves. There is no evidence to refute the fact that: (1) Cpl. Logsdon understood that the car had been stolen; (2) the driver had been told to exit the vehicle with his hands up and had not responded; (3) Cpl. Logsdon saw the decedent frantically reaching into his pocket; (4) Cpl. Logsdon screamed for decedent to show his hands; and (5) decedent did not show his hands and continued to try to get his hand into his pocket.

In analyzing the facts to determine whether, as a matter of law, Cpl. Logsdon is entitled to summary judgment based upon qualified immunity, the Court is aided by reviewing and analyzing other case law.  Among the cases brought to the Court's attention by Defendants are

*Ontiveros v. City of Rosenberg, Texas*, 564 F.3d 379 (5th Cir. 2009) and *Reese v. Anderson*, 926 F.2d 494 (5th Cir. 1991).[20]

In *Ontiveros*, the decedent was involved in a fight after which he threatened to come back with a gun to kill two of the people. The next day, he used a gun to hit one of these individuals. He repeated the threat to come back and kill them. At home, he test-fired his rifle. The threats were reported to the police, who went to arrest Ontiveros. The officer "illuminated Ontiveros with the tactical light on his pistol and saw him a few feet away holding an object over his head. Ontiveros moved behind the door. [The officer] yelled, 'Let me see your hands,' several times in English and continued to view Ontiveros only by glancing around the door with his tactical light. [The officer] then believed he saw Ontiveros reaching into a boot at chest level for what [the officer] believed could be a weapon.  At that point, [the officer] fired two shots. . . . A subsequent search of the bedroom revealed no weapons." 564 F.3d at 381.  The Court held that the officer did not violate Ontiveros' constitutional rights because an officer could have reasonably believed that Ontiveros posed a threat of serious physical harm to himself or other officers.  *Id.* at 385.

In *Reese*, the police were chasing a suspected getaway car from a robbery. 926 F.2d at

---

[20]Plaintiff's Brief relies heavily upon Ninth Circuit precedents despite acknowledging that the Ninth Circuit and Eleventh Circuit have different standards applicable to the issue in this case. [DE 60 at 8 n.2].  This Court declines to rely upon Ninth Circuit cases for this reason. Although there are some differences in the analysis of excessive force cases in the Fifth Circuit, *see, e.g., Reese v. Anderson*, 926 F.2d 494, 500 (enumerating a three-part test for excessive force claims), the Court believes that the analysis in the Fifth Circuit cases cited by Defendants is consistent with the analysis that would be used by the Eleventh Circuit.  While not binding upon this Court, these cases are helpful in the analysis before the Court.  The Court has not, however, considered *Young v. City of Killeen, Texas*, 775 F.2d 1349 (5th Cir. 1985), also relied upon by Defendants, because it pre-dates *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court case that established the "objectively reasonable test".

495.  During the chase, items were thrown from the window that appeared to be parts of a cash

register. *Id.* at 495-96. The car eventually came to a stop.  The officer drew his gun and

repeatedly ordered the occupants to raise their hands. He did so over the sound of the siren from

his patrol car. The front seat passenger repeatedly raised and then lowered his hands. Each time

the officer yelled, the passenger nodded or replied.  The last time the passenger reached down, he

reached further down toward the floorboard and to the left side of the side of the seat. The officer

felt that the passenger had picked up a gun and was going to shoot him and another officer. He

shot the passenger once in the head, from a distance of about ten feet, killing him. *Id*. at 496.  The

passenger was, in fact, unarmed.  *Id.* at 501. The Court held that under the circumstances, a

reasonable officer could fear for his safety and that of others nearby, and the officer was justified

in using deadly force to defend himself and others around him.  *Id*.

There are also Eleventh Circuit cases with fact patterns that are helpful relative to the

issue before the Court.  In *Harrell,* a deputy pulled over a car that was weaving back and forth

across the center line of a highway.  22 F.3d at 1571.  The deputy determined that the driver was

legally intoxicated.  *Id*.  As the deputy was putting handcuffs on the driver, the driver attacked

the deputy, who fought back by using his flashlight. The two men fell to the ground and down an

embankment into a ditch.  The driver took the flashlight and hit the deputy with it several times.

Before leaving the ditch, the driver asked the deputy where his gun was.  Although it was hidden

in the small of his back, he told the driver that it was on the hill.  When the deputy tried to follow

the driver, the driver kicked the deputy to the ground and threatened to kill him.  The driver went

back up the embankment and entered his car from the driver's side. The deputy testified that he

saw the driver bent over reaching for something under the passenger seat. A witness stated that

the deputy shouted, "[h]old it, stop, stop." The deputy shot and killed the driver. The deputy admitted that he never saw a weapon in the driver's hand or anything resembling a weapon in the car. *Id.* at 1571-72. Judge Dubina wrote that the deputy's use of deadly force as an act of self defense struck a balance between the driver's interest in avoiding seizure by deadly force and society's interest in protecting its law enforcement officers that was objectively reasonable. *Id*. at 1581.

In *Garczynski,* the deputies were dealing with a suicidal individual who was sitting in his car. The deputies approached the car from the rear. They could not see into the car because the windows were fogged. They could not open the passenger door. One deputy used a flashlight to smash out the front passenger window. The other deputies shouted commands to Garczynski to show his hands and get out of the car. A deputy also shattered the back passenger window. 573 F.3d at 1163. At some point, the deputies saw Garczynski raise a gun to his temple. The deputies repeatedly ordered him to drop his gun. The deputies testified that Garczynski took the weapon from his head and pointed it at one of the deputies, at which point, the deputies shot and killed Garczynski. Less than two minutes elapsed between the deputies' approach towards the vehicle and the shooting. *Id*. at 1163-64. The Court held that the escalation into deadly force was justified by Garczynski's refusal to show his hands and drop his gun. *Id.* at 1168. The Court added that even if Garczynski had not aimed the gun at the deputies, his failure to drop the gun when ordered to do so justified the use of deadly force under these particular circumstances. *Id.* at 1169.

In the instant case, the facts that the Court views as the most significant to its analysis of whether or not Cpl. Logsdon's use of deadly force was objectively reasonable under the

circumstances are as follows:

1.      The car had been reported as stolen. [DE 59-7; DE 58-4 at 14; DE 59-1 at 4-7; DE 58-7 at 39].

2.      There was no information that the driver was armed or had committed a violent felony.[21] [DE 58-4 at 43; DE 58-7 at 74].

3.      The driver kept trying to restart the car. [DE 58-4 at 38, 129; DE 59-4 at 8-9, 15; DE 59-1 at 53].

4.      The driver ignored commands to exit the car or show his hands both at the beginning of the encounter and after each of the sage shots. [DE 59-1 at 15; DE 58-4 at 36; DE 59-4 at 15];

5.      Cpl. Logsdon could see the driver's right thigh and right pocket area. [DE 58-7 at 84].

5.      The driver was frantically trying to get his hand into his pocket. [DE 58-7 at 84-85, 88].

6.      Cpl. Logsdon did not see a bulge in the pocket in the shape of any type of weapon. [DE 58-7 at 88-89].

7.      Cpl. Logsdon was screaming for the driver to show him his hands, but the driver did not comply. [DE 58-7 at 89; DE 59-2 at 5; DE 58-8 at 9].

In the instant case, as in all of the cases discussed above (except for *Garczynski*), prior to

---

[21]Because the Court determines the evidence before it in the light most favorable to the Plaintiff here, it has not accepted Cpl. Logsdon's testimony that he heard two deputies report over the radio that the driver of the stolen car had tried to run them over. [DE 58-7 at 41]. All of the other evidence was to the contrary [DE 59-4 at 7; DE 59-1 at 8; DE 58-4 at 21]; so the Court accepts the latter for the purposes of this motion since it is more favorable to the Plaintiff.

a deputy using deadly force, the Plaintiff's decedent reached for something; ignored commands to stop or show his hands; was shot and killed; and no weapon was found. These cases differ from the instant case, however, in the following ways. In *Ontiveros*, the decedent had made threats to kill someone and was known to own a gun. In *Reese*, the passenger acknowledged the command to raise his hands both by doing so and by nodding before he reached down, and the officer could not visualize where the passenger's hands were reaching. In *Harrell*, the decedent had attacked the deputy; was looking for the deputy's weapon; and had threatened to kill the deputy. Finally, in *Garczynski*, the decedent had a gun that he refused to drop. For the reasons discussed below, the Court does not find that these factual differences warrant a different resolution.

*Graham* charges the Court to consider factors that include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."Although the initial crime of stealing the car was not a violent felony, Adam Phillips resisted arrest and attempted to evade arrest when he ignored commands to exit the vehicle and kept trying to restart the car. These are not, however, the determinative factors here.

At the point in time that Cpl. Logsdon saw the decedent frantically trying to reach into his pocket as he refused to show his hands, there was at the very least arguable probable cause for Cpl. Logsdon to believe that the driver posed an imminent threat of danger to himself and the other deputies comprising the stick, warranting his use of deadly force. In *Garczynski*, the Eleventh Circuit explained

>          an officer need only have arguable probable cause, not actual

probable cause, in order to qualify for immunity from a Fourth
Amendment claim.  *See Montoute v. Carr*, 114 F.3d 181,184 (11th
Cir. 1997).  Regardless of whether probable cause actually existed,
an officer is entitled to immunity if he "reasonably could have
believed that probable cause existed, in light of the information the
officer possessed."  *Id.*  Qualified immunity thereby protects
officers who "reasonably but mistakenly conclude that probable
cause is present."  *Id.*  (quotation marks and citation omitted).
"Thus, the qualified immunity standard is broad enough to cover
some mistaken judgment, and it shields from liability all but the
plainly incompetent or those who knowingly violate the law."
(quotation marks and citation omitted).

*Garczynski*, 573 F.3d at 1167.

The Court also finds that Cpl. Logsdon gave a warning to the driver.  Although he did not

say that he would use deadly force if the driver did not show his hands, Cpl. Logsdon screamed

for the driver to show him his hands.  Other cases have found this to be a sufficient warning.

*See, e.g., McCullough v. Antolini*, 559 F.3d 1201,1208[22] (11th Cir. 2009); *Btesh v. City of*

*Maitland, Florida*, No. 6:10-cv-71-Orl-19DAB, 2011 WL 3269647 at *20 (M.D. Fla. July 29,

2011) (Although the officer did not warn the decedent that she would shoot before firing upon

him, she and another officer provided unspoken warnings by maintaining their guns drawn while

commanding the decedent to stop and show his hands.), *aff'd*, 471 Fed. Appx. 883 (11th Cir.

2012)(without opinion).  *See also, Harrel,* 22 F.3d at 1579 n. 1 (There was no genuine issue with

---

[22]Although the officer in *McCullough* affirmed that he was able to make eye contact with
the driver when he commanded the driver to show him his hands, the driver did not show his
hands or respond to the command.  As noted above, in *Reese,* the passenger acknowledged the
command to raise his hands both by doing so and by nodding.  In the instant case, Cpl. Logsdon
never made eye contact with the decedent. The Court does not find this to be determinative of
whether an adequate warning was given under the circumstances. At the point in time that Cpl.
Logsdon was screaming for the decedent to show him his hands, there was a hole in the driver's
window through which his commands could be heard.  The Court finds that Cpl. Logsdon did the
best that he could under the circumstances to give the driver a warning.

regard to whether the deputy had given a warning, where witness heard him shout, "hold it, stop, stop."); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1168 (11th Cir. 2009)(Although not specifically addressing the warning issue, the only warnings given were to show his hands and drop his gun).

The Court finds that Cpl. Logsdon's decision to shoot Adam Phillips, as a matter of law, struck an objectively reasonable balance between Phillips' interests and society's interests.  As Justice Dubina wrote in *Harrell*, a person's

> interest in his life, while undoubtedly great, is not absolute, for society has a countervailing interest in effective law enforcement and the protection of its citizens and law enforcement officers. "Policemen on the beat are exposed, in the service of society, to all the risks which the constant effort to prevent crime and apprehend criminals entails: Because these people are literally the foot soldiers of society's defense of ordered liberty, the State has an especial interest in their protection."

*Harrell,* 22 F.3d at 1580 (citations omitted).  This tragedy could have been averted had Phillips exited the vehicle when he was directed to do so or, at the very least, raised his hands when directed to do so by Cpl. Logsdon.  Phillips, therefore, had the means to protect his interests, but failed to do so. Giving him this opportunity before shots were fired demonstrates that his interests were taken into account in this difficult situation.

In a perfect world, Adam Phillips would not have died on December 1, 2008, but the law does not require perfection – it requires objective reasonableness.  Cpl. Logsdon did not have the weeks that this Court has spent reviewing the facts and analyzing the case law.  He did not have days.  He did not have hours.  He did not have minutes.  At the point in time when he saw Adam Phillips trying to get something out of his pocket, he had seconds to decide what to do.  He did

not simply shoot.  He screamed at Mr. Phillips to show his hands.  We will never know why Mr.

Phillips did not do so then, or why he did not exit the vehicle when he was directed to do so

earlier during the encounter.  Whatever the reason was, as the Court sits here today with the

benefit of 20/20 hindsight, it is unreasonable to suggest that Cpl. Logsdon should have assumed

that the reason was innocuous.[23]

The Court finds that under the totality of the circumstances facing Cpl. Logsdon

immediately before he shot Adam Phillips, a reasonable officer would have thought that deadly

force was necessary to avert an imminent threat of danger to himself and/or the other deputies

comprising the stick. Therefore, the Court finds that Cpl. Logsdon's use of deadly force was

objectively reasonable under the circumstances and did not constitute a violation of Adam

Phillips' constitutional rights.  Cpl. Logsdon is entitled to the protection afforded by qualified

immunity and to summary judgment in his favor.

## 2.  Was There a Constitutional Right That Was Clearly Established at the Time of the Incident?

Having determined that there was no violation of a constitutional right, the Court need

not move on to the second test of whether the constitutional right was clearly established at the

time of the incident.  *See, e.g., Garczynski*, 573 F.3d at 1170.  Nevertheless, the Court notes that

neither party found a case from the Supreme Court, the Eleventh Circuit, this Court, or the

Florida Supreme Court materially similar to the instant case. While a case on point is not

---

[23]In *Robinson*, the Eleventh Circuit notes that: "Our precedent instructs us to take into account that "[r]econsideration [after the uncertainty and the excitement of the moment have passed] will nearly always reveal that something different could have been done if . . . the future [was known] before it occurred."  415 F.3d at 1256 (citation omitted).

required to hold that the law clearly established that a defendant's conduct violated the Constitution, the other possible tests to show that the law was clearly established were not met here either. *See, e.g., Long v. Slaton,* 508 F.3d 576, 584 (11th Cir. 2007) (Plaintiffs might point to either earlier case law; general rules of law from a federal constitutional or statutory provision or earlier case law that applied with "obvious clarity" to the circumstances, establishing clearly the unlawfulness of the defendant's conduct.).

As noted above, all of the case law the Court reviewed could be distinguished in some respect from the instant case. Furthermore, all of the cases discussed herein postdate the incident before the Court. Recognizing that the instant case moves further out on the continuum in terms of the quantum of facts that must exist before it can be said that a deputy has arguable probable cause to qualify for immunity, it cannot be said that at the point in time that Cpl. Logsdon decided to shoot Adam Phillips the law was clear that this would constitute a violation of Mr. Phillips' civil rights. Therefore, Cpl. Logsdon is entitled to the protection of qualified immunity under this test as well.

**B.  Plaintiff's Claims Against Ric L. Bradshaw, as Sheriff of Palm Beach County, Florida, for Deprivation of Civil Rights Under 42 U.S.C. §1983.**

In Count III of her Amended Complaint, Plaintiff alleges that her decedent was deprived of his civil rights under 42 U.S.C. §1983 because the Sheriff:

1.  Had a policy and custom of encouraging, tolerating, permitting, and ratifying a pattern of improper conduct by his deputies and employees of which he knew or should have known;

2.  Permitted, encouraged, tolerated and ratified a pattern and practice of unjustified, unreasonable and illegal use of force by his deputies and employees, failed to discipline or

prosecute known instances of wrongful and excessive use of force by his deputies and employees, refused to adequately investigate complaints of previous incidents of wrongful and excessive use of force by his deputies, and instead caused his deputies and employees to believe such conduct is permissible;

3.  Maintained a system of review of complaints of excessive use of force by his deputies and employees which has failed to identify the use of excessive force by those deputies and employees and subject those deputies and employees who use excessive force to discipline, close supervision or retraining to the extent that it has become the de facto policy and custom by the Sheriff to tolerate the use of excessive force by deputies and employees; and

4.  These acts, omissions, and systemic deficiencies are policies and customs of the Sheriff and caused his deputies and employees to be unaware or alternatively unconcerned with the rules and laws governing permissible use of force and to believe that such use of force is entirely within the discretion of the deputies and employees and that such use of force would not be honestly and properly investigated, all with the foreseeable result that deputies and employees are more likely to use excessive force in situations where such force is neither necessary nor reasonable nor legal. [DE 20 at 9-10].

Since it has been determined that the deputies did not violate Adam Phillips' constitutional rights, all of Plaintiff's claims against Sheriff Ric Bradshaw fail as well, and the Sheriff is entitled to summary judgment. *See, e.g., Garczynski*, 573 F.3d at 1170 ("Analysis of a state entity's custom or policy is unnecessary, however, when no constitutional violation has occurred.").

**B. State Law Claims**

Count IV of the Amended Complaint asserts a state law negligence claim against Sheriff Bradshaw, [DE 20 at 11-13], and Count V asserts state law claims of assault and battery against Sheriff Bradshaw and Cpl. Logsdon. [DE 20 at 13-15]. Having dismissed the federal constitutional claims in the Amended Complaint, the Court must now consider whether to retain jurisdiction over these state law claims.

This Court derives its authority to decide Plaintiff's federal claims from 28 U.S.C. § 1331, which provides that district courts have original jurisdiction over civil actions "arising under the Constitution, laws, or treaties of the United States." Federal courts are given the additional power to exercise supplemental jurisdiction over state law claims "that are so related to claims in the action . . . that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

Section 1367(c)(3), however, states that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ." Here, as the Court has determined that the claims serving as the basis for original federal court jurisdiction fail as a matter of law, the Court also concludes that any potential state law claims should be dismissed without prejudice so that Plaintiff may, if she chooses, pursue them in state court.

Therefore, in accordance with the conclusions reached above, it is hereby **ORDERED AND ADJUDGED** that Defendant Sheriff Ric L. Bradshaw's Motion for Summary Judgment **[DE 49]**, Defendant Logsdon's Motion for Summary Judgment **[DE 52]**, and Defendant Worthington's Motion for Summary Judgment **[DE 53]** are **GRANTED WITH PREJUDICE** on all claims based on federal law   All claims based on state law are **DISMISSED WITHOUT**

**PREJUDICE**.  In accordance with Fed. R. Civ. P. 58, final judgment will be entered by separate order.

   **DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 28th day of March, 2013.

                     _____
                      KENNETH A. MARRA
                      United States District Judge